# CHARLESTON.

GREAT EASTERN REFINING CORP. v. HERMAN SHANK, ETC.

(No. 5224)

Submitted April 28, 1925. Decided May 5, 1925.

1. PRINCIPAL AND AGENT—*Knowledge of Shortage in Merchandise Discovered by Employe is Imputed to Employer.*

An employe unloading merchandise discovers, but does not report a deficiency in the quantity thereof to his employer. Held: the knowledge of the shortage by the employe is imputed to the employer. (p. 105).

(Agency, 2 C. J. § 542).

2. SALES—*Buyer Has Duty to Use Ordinary Diligence to Examine Goods on Arrival and Notify Seller of Any Shortage Claimed.*

It is the duty of a purchaser to use ordinary diligence to examine goods purchased, upon arrival, and to notify the seller, within a reasonable time, of any shortage therein claimed. (p. 106).

(Sales, 35 Cyc. p. 213).

3. SAME—*Failure of Buyer to Notify Seller of Shortage Until Opportunity to Investigate it is Gone Generally Prevents Recovery by Buyer.*

Failure of a purchaser to so notify the seller until all opportunity of investigating the alleged shortage is gone, will generally prevent the purchaser from recovering therefor. (p. 107).

(Sales, 35 Cyc. p. 213).

99 W. Va.

4. APPEAL AND ERROR—*Verdict for Defendant on Claim of Set-offs or Recoupment Not Supported by Competent Evidence Will be Set Aside.*

A verdict in favor of a defendant on a claim of off-set or recoupment not supported by competent evidence will be set aside. (p. 107).

(Appeal and Error, 4 C. J. § 2835).

NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.

Error to Circuit Court, Cabell County.

Action by the Great Eastern Refining Corporation against Herman Shank, etc. Judgment for defendant, and plaintiff brings error.

*Judgment reversed; verdict set aside; new trial awarded.*

*J. W. Perry,* and *Scott, Graham & Wiswell,* for plaintiff in error.

*Deegan & Hall,* for defendant in error.

HATCHER, JUDGE:

This is an action in assumpsit brought in the Circuit Court of Cabell County. From a judgment in favor of the defendant for $1,293.07, the case is here on error.

The plaintiff is a manufacturer of gasoline in Kentucky, about twelve miles from Huntington, West Virginia. The defendant sells gasoline at both wholesale and retail in Huntington, where he operates several service stations. As part of his equipment for handling gasoline, he has two storage tanks with an aggregate capacity of about 30,000 gallons. The gasoline shipped to him in tank cars is unloaded into these storage tanks.

The suit of the plaintiff is for $6,775.65 due for gasoline sold to the defendant. Following notice of set-off and recoupment, a stipulation was made by the defendant, and read to the jury in which he admitted the correctness of the plaintiff's account, but claimed an off-set against the plaintiff in the sum of $8,794.84. The stipulation further stated that the sole question for the jury to try was whether the defendant was entitled to the amount of the counterclaim. The plaintiff denied the defendant's claim, and issue was joined thereon.

The evidence of the defendant is that on June 6, 1922, his books indicated that there were 4,283 gallons of gasoline in his tanks. From June 6, 1922 until April 30, 1923, he purchased from the plaintiff 861,002 gallons of gasoline. During that same period, he purchased from other concerns 110,912 gallons of gasoline, which were emptied into the same tanks and sold in the same manner as that received from plaintiff. These two amounts, added to the quantity in his tanks on June 6, 1922, made 976,197 gallons, which should have been available to him during that period. According to his books, the amount of gasoline sold from his stations and tank wagons during that period was 922,417 gallons. These figures were derived from slips for gasoline sold, which were returned daily to defendant's bookkeeper by employes in charge of his tank wagons and filling stations. He estimated a loss of 2,300 gallons through evaporation during that period. On April 30, 1923, there were 8,799 gallons in his tanks. The total amount sold and evaporated added to the quantity on hand at the end of the period made 933,516 gallons. This number, deducted from the amount purchased, etc., during the period showed a difference of 42,681 gallons. The defendant charged the entire amount of this shortage to the plaintiff. The purchase price of this alleged shortage represented the amount of the off-set.

During the period in which he complains of shortage, the defendant had no inspection of the tank cars made before unloading, and kept no record of the number of gallons of gasoline each car actually contained. No one for defendant testified to any actual shortage in the cars except a witness by name of Black, who worked for the defendant until December 24, 1922. Black unloaded all the tank cars that came to the defendant while in his service. He stated that when the cars of the plaintiff first commenced to come to the defendant, they were full, but "along towards the last they were not full." He would not commit himself as to the number, or over how long a period the cars were not full. He said there were "lots of them which lacked one to six inches of being full." He never mentioned the shortage to the defendant while in his employment. The defendant testified to having discovered a total shortage of 505 gallons in

fourteen of plaintiff's cars after April 30, 1923, which shortage was reported to and adjusted by the plaintiff.

The evidence of the plaintiff is that the tank cars shipped to the defendant were all stenciled with their capacity in gallons; that it was necessary to take the cap off the dome of a car to unload it, when one could see at a glance the amount of gasoline in the car; that when the car was filled, the gasoline came up in the dome of the car; that if the car was full of gasoline, this fact was noted in the invoices, and if the gasoline did not reach the dome, the invoice would state how many inches it lacked of reaching the dome, and a deduction in contents noted accordingly; that all cars sent defendants were carefully inspected and correctly invoiced; that in addition to the number of gallons in the car, the invoices stated the temperature of the gasoline at the time of shipment; and that there was always some loss occasioned in shipping. gasoline. No complaint was received by plaintiff from defendant prior to April 30, 1923.

The defendant offered no evidence whatsoever to show that the shortage in gasoline indicated by his books was not due in part or whole to the gasoline purchased from concerns other than the plaintiff, or to the conduct of his own employes.

The defendant paid plaintiff for gasoline as invoiced up to April 30, 1923. Plaintiff's suit is for shipments made after that time. Defendant's counterclaim is for shortage *before that time.*

The errors relied upon by the plaintiff are that the court erred (a) in refusing to allow a witness for plaintiff to testify as to a certain custom of the gasoline trade; (b) in refusing to give plaintiff's instruction number 1; and (c) in refusing to set aside the verdict of the jury.

In oral argument, counsel stated that the plaintiff did not rely, to any great extent, on the first assignment of error. We think the lower court ruled correctly in regard thereto. The witness did not know that the custom sought to be proven was a custom generally prevailing at Huntington.

Plaintiff's instruction number 1 would have told the jury that it was the duty of the defendant to examine all cars of gasoline before unloading, and in case a shortage of gaso-

line was found, to notify the plaintiff of the shortage before the car was unloaded. This would have been a very fair course for the defendant to have pursued, but we are not prepared to say that the law would necessarily cast that duty upon him under all situations. Suppose his tanks were low, and he needed the gasoline which the car contained for his trade. Are we to say that he should allow his business to suffer and not unload the car while waiting to hear from the plaintiff as to the shortage? We think not. Inspection of the car by a disinterested party would meet the demands of fair dealing in such case.

The third assignment of error may be considered from two standpoints.

1. The burden was on the defendant to prove his counter-claim. His evidence must be weighed exactly as if he were plaintiff in a suit brought against the Great Eastern Refining Corporation to recover the shortage claimed. He must trace all of the shortage directly to plaintiff. He must show a clear right of recovery against the plaintiff.

He bases his claim for shortage on his books. The inaccuracy of his books is at once apparent upon consideration of the fact that if the consignments of gasoline to the defendant had been short on April 30th the number of gallons which his books showed, his tanks would have been dry at that time, instead of containing 8,799 gallons, as he admitted. Again, in a letter to the plaintiff, he stated that his books showed a shortage on certain cars shipped after April 30th amounting to *5,000* gallons. The actual shortage on these cars was only *505* gallons. The accuracy of defendant's books as to the quantity of gasoline sold, depends entirely on the accuracy of the sale slips turned in to his bookkeeper. He produced no evidence that they were correct.

From his statement that he had noticed no shortage in gasoline shipped him by concerns other than the plaintiff, he would have the jury *infer* that none existed in their shipments during the period in question. Because Mr. Black noticed cars from plaintiff not entirely full during the latter part of his employment by the defendant, and because fourteen cars from plaintiff after April 30, 1923, showed a slight shortage, he would have the jury also *infer* that all

of the shortage which he claims was therefore chargeable to the plaintiff.

The employes of plaintiff who loaded and invoiced the cars during this period testified that they were invoiced correctly. On this matter, the evidence preponderates in favor of the plaintiff. To meet the evidence of the men who loaded and invoiced the cars, the defendant offers only inferences, the indefinite evidence of Mr. Black, and book records, the correctness of which depends on the accuracy and honesty of employes who are not put on the witness stand. The alleged shortage could have occurred in several ways not chargeable to the plaintiff. For example, gasoline could have been stolen from the cars while in charge of the railroad company; loss may have occurred through leakage in defendant's storage tanks; loss may have been occasioned by careless handling of the gasoline on defendant's tank wagons and at his filling stations; gasoline may have been given away or otherwise disposed of by defendant's employes; or the shortage may be chargeable in whole or in part to consignments from refiners other than the plaintiff. The defendant has not made out a case. The facts proven do not warrant the inferences claimed. His evidence does not sustain the verdict. *Distilling Co.* v. *Bauer,* 56 W. Va. 249.

2. The evidence does not show what employe of the defendant unloaded the cars after Mr. Black quit work for him on December 24, 1922. If there was a shortage of gasoline in plaintiff's cars between then and April 30, 1923, this employe would have observed it. The knowledge of Mr. Black and the knowledge of this other employe in this respect is attributed to the defendant. Information of the daily balances struck on his books showing a shortage must also be attributed to the defendant. The law imputes notice to him of these alleged shortages. 11 Mechem, Law of Agency, par. 1813; *Buckeye, etc. Co.* v. *Rutherford,* 65 W. Va. 395.

In the case of *Gamble* v. *Knott & Hollingsworth,* 40 Ga. 199, the plaintiff sold to the defendants certain stock, provisions and agricultural implements on a farm, which he, at the time, leased them. The defendants took possession of the farm, made a crop, and paid part of the rent without any complaint. At the end of the year, they claimed a deficiency

in the quantity of stock and provisions purchased from plaintiff. The court held that the defendants

> "knew when they took possession of the place, or might have known by the exercise of ordinary diligence, what was on it, and if there was any material deficiency in anything represented to be on the place, then was the time for them to have repudiated the contract if they had desired to do so."

In the case of *Higbie* v. *Rogers,* a New Jersey case reported in 50 Atl. 366, the purchaser of a drug store tried to offset a portion of the purchase price thereof because of alleged deficiencies in certain articles called for in the bill of sale. The court, in that case, held:

> "Where the purchaser of a drug store does not call the attention of the seller to·a deficiency in the number of bottles sold, within a reasonable time, in order to allow the seller to verify such deficiency, the deficiency cannot be set up as a deduction from the purchase price in a suit to redeem from a purchase-money chattel mortgage."

In *Bogue et al.* v. *Newcomb et al.* 1 New York Supreme Court Reports, 251, the defendants received, without inspection, timber which the plaintiffs had agreed to furnish of a certain size. In that case, the court held:

> "Defendants could not, after having received the same and sawed it up without measuring, avoid payment on the ground that such timber was not in accordance with the contract."

The same rule underlies each of these decisions. It is the duty of a purchaser to exercise ordinary care to examine the goods purchased and to notify the consignor within a reasonable time in case of any shortage or deficiency therein. If a buyer, after observing defects or deficiencies in purchases could legally delay claim therefor until all evidence thereof is lost except charges on his books, the seller would always be at the mercy of the purchaser. Justice requires that the seller be given an opportunity to investigate charges of shortage, at a time when an investigation would be fruitful. In *Bartholomae* v. *Paull,* 18 W. Va. 771, *Thompson* v. *Douglass,* 99 W. Va.

35 W. Va. 337, *Ford* v. *Freidman,* 40 W. Va. 177, and *Linger* v. *Wilson,* 73 W. Va. 669, this court has reiterated the principle that a purchaser to whom is shipped more goods than ordered, must, within a reasonable time, return the goods or notify the seller that he will not accept them because of the excess of quantity; otherwise, the law will imply a ratification on his part. If it be the duty of a purchaser to act promptly in case of excess of quantity received, for equal reasons, should he act with promptness when there is a deficiency in the quantity of goods ordered.

The plaintiff had placed its product in defendant's possession, and the invoices therefor in defendant's hands. There was no duplicity on its part. Every invoice stated the number of gallons which plaintiff said the car contained. The defendant then had the invoice, the tank car, and the means and the opportunity of ascertaining whether the invoice was correct. His conduct toward plaintiff should have been open and fair. Honest merchants welcome the opportunity to correct a mistake when an investigation shows that a mistake has been made. They rightly resent a charge of mistake where no opportunity of investigation is possible. This observation is well illustrated in this case. The shortage occurring after April 30th and to which plaintiff's attention was promptly called, was adjusted. As to the shortage between June 2, 1922 and April 30, 1923, a representative of the plaintiff said to the defendant ''To hell with your shortage.'' No complaint having been made within a reasonable time, the plaintiff assumed, and had the right to assume, that its invoices were correct.

Failure of the defendant to have the cars inspected, to have the shortage, if any, recorded at the time, and to have the plaintiff promptly notified, constitute such inattention and neglect of duty as the law will not palliate. In justice to plaintiff's rights, the defendant will not be permitted to delay until all opportunity of investigation is gone, and then maintain at law a claim for shortage.

The judgment of the lower court will therefore be reversed, the verdict of the jury set aside, and the plaintiff awarded a new trial.

*Judgment reversed; verdict set aside; new trial awarded.*